d

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

TATALU HELEN DADA, *ET AL.*
Petitioners

CIVIL DOCKET NO. 1:20-CV-00458

VERSUS

JUDGE DRELL

DIANNE WITTE, *ET AL.* ,
Respondents

MAGISTRATE JUDGE PEREZ-MONTES

---

## REPORT AND RECOMMENDATION

Petitioners are civil immigration detainees.  All await removal or other immigration proceedings.  All attest that they are particularly vulnerable to the novel coronavirus, or "COVID-19."   And all seek immediate release from custody to until they are removed from the United States or their immigration proceedings are resolved.  Respondents are the Department of Homeland Security/United States Immigration and Customs Enforcement ("ICE") and various officials responsible for some aspect of Petitioners' detention.  Respondents oppose Petitioners' release on jurisdictional and substantive grounds.

Both sides advance legitimate positions.  And together, they have established a substantial record.  The Court must decide whether Petitioners are entitled to release given the risk factors associated with their detention, including their individual vulnerabilities to COVID-19.

Petitioners may seek habeas corpus relief under 28 U.S.C. § 2241 and injunctive relief under Fed. R. Civ. P. 65.  The Due Process Clause of the Fifth

Amendment requires release if, given a particular situation, a Petitioner's detention is no longer reasonably related to legitimate governmental purposes.

The relevant facts facing Petitioners, ICE, correctional officers, and the public, may also favor release. Under ordinary circumstances, ICE often releases civil detainees who do not pose a risk of flight or danger. Under these extraordinary circumstances, release is an even more viable option. Densely-populated facilities endanger those detained and working inside. That danger spills into surrounding communities. For these reasons, thousands of federal prisoners, state prisoners, and ICE detainees have already been conditionally released from detention facilities.[1]

In this case, 13 of the 16 Petitioners should also be conditionally released. One remaining Petitioner has tragically tested positive for COVID-19. Another has been released. And another has failed to establish a present right to release. All Petitioners' immigration proceedings will proceed as normal, and any other detainee's circumstances remain unchanged. But these Petitioners have established that their detention poses a grave and unconstitutional risk while failing to meaningfully serve ICE's or the public's interest. As such, injunctive relief is warranted under the Due Process Clause of the Fifth Amendment.

---

[1] The United States Bureau of Prisons has released 1,805 prisoners to home confinement. *COVID-19 Home Confinement Information*, https://www.bop.gov/coronavirus/index.jsp (last visited Apr. 30, 2020). And the Chief Justice of the Louisiana Supreme Court has urged Louisiana judges to "minimize the number of people detained in jails where possible." *Letter to the Louisiana District Judges*, Apr. 2, 2020, https://www.lasc.org/COVID19/2020-04-02-LASC-ChiefLetterReCOVID-19andjailpopulation.pdf.

## I.   Background

### A.   Procedural Background

Counsel for Petitioners originally filed this lawsuit in the United States District Court for the Eastern District of Louisiana. *Dada v. Witte*, No. CV 20-1093, 2020 WL 1674129 (E.D. La. Apr. 6, 2020).  But Petitioners are all presently detained in this District.  So the Eastern District dismissed the suit without prejudice under the "immediate custodian rule," which requires Petitioners to seek relief in the district of their confinement. *See id.* at *3.

Petitioners then refiled before this Court, seeking the same relief, including a TRO. *See* ECF Nos. 1, 2.  Shortly after filing, the undersigned set an expedited briefing schedule and an evidentiary hearing (hereinafter, the "Hearing"). ECF No. 6.  The parties submitted briefs and numerous exhibits.

At the Hearing, counsel for both sides argued, but did not offer additional evidence or testimony.  All counsel confirmed that the record before the Court was adequate, and that additional briefing and evidence were unnecessary.  However, since the Hearing, counsel for Petitioners have submitted notices and supplemental evidence.  Tragically, among these submissions was: (1) a Notice that one Petitioner recently tested positive for COVID-19 (ECF No. 15); and (2) a news article indicating that two guards at Richwood Correctional Center have died after exhibiting symptoms consistent with COVID-19 (ECF No. 16-2).

Petitioners' Motion for TRO (ECF No. 2) remains pending before the Court and ripe for disposition.

B.   Factual Background

1.   The COVID-19 pandemic threatens human life and vital institutions, particularly at detention centers.

At this juncture, there is likely no need to describe the COVID-19 pandemic in detail.  As to its disruption of daily life, one court stated that "[t]he virus has . . . upended American economic and social life, causing schools and businesses to shutter, and even the nominally unaffected to wear masks and stand six feet apart in public." *Adams & Boyle, P.C. v. Slatery*, No. 20-5408, 2020 WL 1982210, at *2 (6th Cir. Apr. 24, 2020).  As to its devastating toll upon human life, according to the Centers for Disease Control and Prevention ("CDC"), 1,005,147 cases and 57,505 deaths have been reported in the United States.[2]   In Louisiana, 28,001 cases and 1,862 deaths have been reported.[3]   And in the Louisiana parishes home to the detention facilities housing Petitioners: (1) Ouachita Parish – 706 cases, 16 deaths; (2) LaSalle Parish – 23 cases; (2) Winn Parish – 32 cases, 2 deaths; (4) Catahoula Parish – 36 cases, 2 deaths; (5) Jackson Parish – 34 cases, 2 deaths; and (6) Evangeline Parish – 49 cases, 1 death.[4]

Given those tragic realities, the United States Court of Appeals for the Fifth Circuit has stated that "COVID-19 poses risks of harm to all Americans." *Valentine v. Collier*, No. 20-20207, 2020 WL 1934431, at *5 (5th Cir. Apr. 22, 2020).  At present,

---

[2] *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 30, 2020).

[3] *Louisiana Coronavirus (COVID-19) Information,* available at http://ldh.la.gov/coronavirus/ (last visited Apr. 30, 2020).

[4] *Id.*

4

COVID-19 remains medically "incurable" in the sense that "[t]here are no drugs or other therapeutics . . . approved by the . . . [(FDA)] to prevent or treat COVID-19."[5] COVID-19 appears to be highly infectious and transmissible, particularly where people are in close physical proximity with one another.[6] "The best way to prevent illness is to avoid being exposed to this virus," specifically by avoiding close contact with others, sanitizing, and wearing protective face covers.[7]

In large part due to these characteristics, COVID-19 has severely impacted detention facilities. This Court and many others have noted particular concern regarding the effect of COVID-19 in prisons. *See, e.g.*, *United States of America v. Vacarra Rogers*, No. CR 3:15-00058-01, 2020 WL 1987350, at *2 (W.D. La. Apr. 27, 2020). The cause is apparent: "As warned by the CDC, conditions of confinement inherently prevent one's ability to socially distance, which, until a treatment is discovered, or a vaccine developed, is the best measure to reduce the spread of the disease." *Sallaj v. U.S. Immigration & Customs Enf't ("ICE")*, No. CV 20-167-JJM-LDA, 2020 WL 1975819, at *3 (D.R.I. Apr. 24, 2020). Thus, "[t]he CDC has acknowledged the particular challenges faced by correctional and detention facilities in controlling the transmission of COVID-19 and has provided some guidance, as

---

[5] *CDC Information for Clinicians on Investigational Therapeutics for Patients with COVID-1,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/therapeutic-options.html (last visited Apr. 29, 2020).

[6] *See* How *COVID-19 Spreads*, available at https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Coronavirus-Disease-2019-Basics (last visited Apr. 29, 2020).

[7] *See How to Protect Yourself & Others*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 29, 2020).

5

several courts have recognized." *See United States v. Morris*, No. 3:19-CR-573-B, 2020 WL 1694301, at *4 (N.D. Tex. Apr. 6, 2020).

Moreover, "older adults [age 65 and older] and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19."[8]  Underlying medical conditions may include: (1) chronic lung disease; (2) moderate to severe asthma; (3) serious heart conditions; (4) immunocompromising conditions, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; (5) severe obesity; (6) diabetes; (7) chronic kidney disease undergoing dialysis; and (8) liver disease.[9]

### 2.  Petitioners seek specific and limited relief.

Petitioners do not challenge their underlying immigration or removal proceedings.  Petitioners also do not seek corrective relief for the specific conditions of their confinement.  Instead, and in relevant part, Petitioners seek immediate release given their individual circumstances.

## II.  Law and Analysis

### A.  Jurisdiction

#### 1.  The Court need only address jurisdiction under 28 U.S.C. § 2241.

""Federal courts must resolve questions of jurisdiction before proceeding to the merits." *Ashford v. United States*, 463 F. App'x 387, 391-92 (5th Cir. 2012).

---

[8] *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 29, 2020).

[9] *Id.*

Petitioners assert several potential bases of jurisdiction.   Among them is habeas corpus jurisdiction.   Under 28 U.S.C. § 2241(c)(3), a district court may grant a writ of habeas corpus where an individual is "in custody in violation of the Constitution or laws or treaties of the United States."

> ### 2.   The Court has jurisdiction under § 2241 because Petitioners challenge the "fact and duration" of their detention, not their "conditions of confinement."

Respondents argue that the Court lacks jurisdiction to consider Petitioners' claims under 28 U.S.C. § 2241.   This argument is based upon the distinction between "conditions of confinement" claims ("conditions claims") and "fact or duration of confinement" claims ("fact claims").   The parties agree that a petitioner may, and should, assert fact claims under § 2241.   *See Poree v. Collins,* 866 F.3d 235, 243 (5th Cir. 2017).   But the parties dispute which type of claim Petitioners assert, and which "procedural vehicle" is appropriate for conditions claims.   Because Petitioners assert fact claims, not conditions claims, the question regarding the correct procedural vehicle for conditions claims is not addressed. [10]

Like the parties here, courts have long disagreed on these issues.   But the United States Supreme Court and the Fifth Circuit have provided meaningful guidance.   In *Muhammad v. Close*, for instance, the Supreme Court upheld a state prisoner's right to assert a damages claim under 42 U.S.C. § 1983.   540 U.S. 749, 124

---

[10] Many courts have approved ICE detainee conditions claims under § 2241.   Respondents correctly point out that decisions in this circuit, while consistently skeptical, have not explicitly approved or prohibited § 2241 conditions claims.   *See, e.g., Poree,* 866 F.3d at 243 ("While 'fact or duration' claims must be brought under habeas, the Supreme Court [and some other circuit courts] ha[ve] not foreclosed the use of habeas for other kinds of claims.").

S. Ct. 1303, 158 L. Ed. 2d 32 (2004).  The prisoner had been convicted of a disciplinary offense and claimed to have suffered damages while detained for that conviction.  *See id.*  However, the prisoner did not ultimately challenge his conviction; he sought only damages, not expungement or reversal.  *See id.* at 754.

> The Court emphasized the distinction at issue here:
>
> Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983.  Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus, *Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); requests for relief turning on circumstances of confinement may be presented in a § 1983 action.

*Id.* at 750.  The Court cited *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), a case which bars § 1983 actions that "would implicitly question the validity of conviction or duration of sentence."  *Muhammad*, 540 U.S. at 751.  The Court then clarified that the *Heck* prohibition does not apply to "a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence," in part because "there is no need to preserve the habeas exhaustion rule and no impediment under *Heck* in such a case."  *Id.* at 751-52.

Though not directly on point, *Muhammad* is clearly instructive.  Petitioners do not attack their underlying immigration proceedings.  Like the prisoner in *Muhammad*, Petitioners seek relief that would not risk or affect the validity of their underlying immigration cases.

8

Still, Respondents argue that claims implicating "conditions" associated with a detention facility must be "conditions claims."  But the cases cited by Respondents reveal why it misses the mark, particularly here.

First, Respondents cite cases addressing conditions claims obviously centered upon the "conditions" themselves. To reconcile these cases, Respondents argue that Petitioners here attack the conditions of their confinement as well, including the physical space, sanitary conditions, and available medical care.  But in the cited conditions cases and others, *the conditions are the targeted harm*.  When fact claims are mentioned, however, *conditions are indicators of the targeted harm: the confinement itself.  See, e.g.*, *Poree*, 866 at 242 (holding that a challenge to a judge's decision denying a prisoner's transfer to a transitional home and ordering that the prisoner remain in a mental health facility was a fact claim properly asserted as a habeas claim); *Schipke v. Van Buren*, 239 F. App'x 85 (5th Cir. 2007) ("Schipke raised numerous claims pertaining to perceived injustices regarding her medical treatment and the conditions of her detention.").

Second, the remedy for conditions claims is generally corrective.  The remedy for fact claims, however, generally terminates the detention altogether, or alters it such that a new form of custody or control is imposed.  *See Poree*, 866 F.3d at 244 (""A request for relief from an initial civil confinement institution to a transitional home is similar [to a request for physical release].  Residence in a transitional home—a condition of Poree's release from ELMHS—bridges the gap between his total confinement and total freedom."); *Schipke*, *239 F. App'x at 85* (holding that "a

prisoner cannot avail herself of habeas corpus relief when seeking injunctive relief that, as in this case, is unrelated to the cause of her detention," where a prisoner "sought an order for injunctive relief modifying the conditions of her detention"); *Hernandez v. Garrison*, 916 F.2d 291, 293 (5th Cir. 1990) (a prisoner's Eighth Amendment and discrimination claims, seeking transfer to another facility due to "overcrowding, and denial of medical treatment and access to an adequate law library," were "not a proper subject for a habeas corpus petition"); *Sarres Mendoza v. Barr*, No. CV H-18-3012, 2019 WL 1227494, at *3 (S.D. Tex. Mar. 15, 2019) (dismissing a detainee's damages claims because "compensatory or monetary damages are not available in a habeas corpus proceeding," but deciding the lawfulness of the detainee's continued detention).

These cases and others illustrate that Respondents' arguments must fall short. As a general premise, "the Supreme Court has clearly found jurisdiction under . . . § 2241 in [statutory and constitutional] challenges to post-final-order-of-removal detention." *Ali v. Dep't of Homeland Sec.*, No. 4:20-CV-0140, 2020 WL 1666074, at *2 (S.D. Tex. Apr. 2, 2020) (citing *Clark v. Martinez*, 543 U.S. 371, 386–87 (2005); *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001)). Adopting Respondents' position here would contravene that general premise.

Returning to the distinction between conditions and fact claims, Respondents seem to use the mere mention of a "condition" as the line of demarcation. But the jurisprudence indicates that two different characteristics actually separate conditions claims from fact claims: (1) the nature of the claim; and (2) the remedy

10

requested.  *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475, 500, 93 S. Ct. 1827, 1841, 36 L. Ed. 2d 439 (1973) ("[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.").

As to the first characteristic, by nature, a fact claim challenges the detention itself.  Conversely, by nature, a conditions claim attacks circumstances associated with the detention.  As to the second characteristic, if a petitioner seeks immediate release or similar relief, the petitioner must do so through a fact claim.  But if a petitioner seeks correction of a circumstance or event associated with detention, the petitioner must do so through a conditions claim.  *See Coleman v. Dretke*, 409 F.3d 665, 669 (5th Cir. 2005) ("[I]t is well established that release from physical confinement in prison constitutes release from custody for habeas purposes, even though the state retains a level of control over the releasee.").

These characteristics may be "blurry" in some situations.  *Poree* 866 F.3d at 168.  But the Fifth Circuit clearly endorses them: "Which statutory vehicle to use depends on the nature of the claim and the type of relief requested. . . . "'[R]elease from physical confinement . . . constitutes release from custody for habeas purposes, even though the state retains a level of control over the releasee.'"  *Id.* (quoting *Coleman v. Dretke*, 409 F.3d 665 (5th Cir. 2005), and collecting other Fifth Circuit cases); *see also Carson v. Johnson*, 112 F.3d 818, 820–21 (5th Cir. 1997) ("If a favorable determination . . . would not automatically entitle [the prisoner] to

accelerated release, . . . the proper vehicle is a § 1983 suit.") (internal citation and quotations omitted).  And if Petitioners can neither seek immediate release under § 1983 nor seek immediate release through habeas corpus, alternative remedies would be scarce, if available at all.  *Sacal-Micha v. Longoria*, No. 1:20-CV-37, *2020 WL 1815691, at \*8 (S.D. Tex. Apr. 9, 2020)* (noting, but dismissing, the same concern, because the petitioner had "not demonstrated an absence of alternative remedies that would warrant recognizing his cause of action directly under the Fifth Amendment").

Applying the first characteristic, Petitioner's claims center upon the fact of their detention as the harm to be redressed.  Petitioners reference "conditions" associated with their detention only to establish that the fact of detention is no longer "reasonably related to a legitimate government objective" – in other words, to establish that their detention is "punitive" under the circumstances, and therefore, unconstitutional.  Applying the second characteristic, Petitioners seek relief available traditionally, if not only, through habeas corpus: release.

Critically, the "conditions" facing Petitioners likely would be implicated by either type of claim.  But "[t]he mere fact that Plaintiffs' constitutional challenge requires discussion of conditions in immigration detention does not necessarily bar such a challenge in a habeas petition."  *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at \*4 (S.D. Tex. Apr. 17, 2020).[11]

---

[11] Respondents also argue that Petitioners' claims are not related to the "cause of detention." The Court disagrees.

The Fifth Circuit has stated that the "sole function" of a habeas corpus petition "is to grant relief from unlawful imprisonment or custody."  *Pierre v. United States*, 525 F.2d 933, 935-36 (5th Cir. 1976).  The "legality of custody," or the "cause of detention," is its only legitimate

Finally, Respondents suggest that some of the Petitioners' detention is mandatory.  But mandatory detention statutes must, and often do, give way to the dictates of the Constitution, including Petitioners' rights under the Fifth Amendment.  *See Malam v. Adducci,* No. 20-10829, 2020 WL 1672662, at *13 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020) ("Petitioner's continued detention is in violation of the United States Constitution, to which 8 U.S.C. § 1226(c) must give way.").[12]  "[T]he Supreme Court has consistently allowed for habeas challenges to

---

aim in habeas; "collateral administrative relief" or other unrelated matters are beyond its proper scope.  *Id.*  Petitioners argue that the "causes" that justified detention have now shifted.  *See Vazquez Barrera v. Wolf,* No. 4:20-CV-1241, 2020 WL 1904497, at *6 (S.D. Tex. Apr. 17, 2020) The same logic separates the claims and mechanisms available to pretrial detainees and other civil detainees, and those available to convicted prisoners.

[12] At the Hearing, Respondents argued that the United States had not waived its sovereign immunity regarding Petitioners' claims.   Respondents conceded that "§ 2241 waives sovereign immunity," but does not concede to waiver of sovereign immunity for issuance of a TRO.  Because Petitioners seek and are entitled to fact claim relief, the appropriate remedy for that relief is a petition for habeas corpus under § 2241.  *See Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (If a Plaintiff wishes to challenge "the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus."); *see also Poree v. Collins,* 866 F.3d 235, 243 (5th Cir. 2017) ("Typically, habeas is used to challenge the fact or duration of confinement, and 42 U.S.C. § 1983 is used to challenge conditions of confinement."); *Anekwu v. Immigration & Customs Enf't,* 1:18-CV-1567-P, 2019 WL 2147931, at *1 (W.D. La. Feb. 14, 2019), *report and recommendation adopted,* 1:18-CV-1567-P, 2019 WL 2134538 (W.D. La. May 15, 2019).

In a factually similar case, the United States District Court for the Eastern District of Michigan found sovereign immunity did not apply in this context, and even if it did, that it had been waived.  *See Malam v. Adducci,* 20-10829, 2020 WL 1672662, at *5 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) ("Sovereign immunity does not apply in this instance, and even if it did, it has been statutorily waived. Federal courts may exercise the traditional powers of equity in cases within their jurisdiction to enjoin violations of constitutional rights by government officials.").   The undersigned agrees entirely with the *Malam* court's reasoning.

detention statutorily mandated by the Immigration and Nationality Act." *See Vazquez Barrera*, 2020 WL 1904497, at \*5; *see also Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at \*6 (S.D.N.Y. Mar. 26, 2020) ("[C]ourts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c).").[13]

Each day, courts across the country are deciding similar cases arising from the COVID-19 pandemic. Unfortunately, consensus still eludes us. But so far, this Court has identified the same distinction in a different context, and has not reached a contrary result.[14] Other courts – a growing majority, it seems – have arrived at the

---

[13] At the Hearing, respondents also pointed out that Petitioners have different personal situations and are housed in different facilities. Petitioners have not sought class certification or formally requested permissive joinder, but instead simply filed the action together as Petitioners. Respondents have not filed a motion requesting that Petitioners' claims be severed or separated into 16 lawsuits. As such, no issue regarding the presence of multiple Petitioners was brought to the Court for decision.

Nevertheless, the Court notes that joinder of Petitioners' claims here is appropriate. The joint adjudication of habeas corpus claims is neither prohibited nor unprecedented, especially where interests of all litigants and judicial economy would be best served. *Hatfield v. Young*, No. 5:18-CV-01265, 2019 WL 4196613, at \*6 (S.D.W. Va. June 7, 2019), *report and recommendation adopted,* No. 5:18-CV-01265, 2019 WL 4197117 (S.D.W. Va. Sept. 3, 2019), *aff'd,* 790 F. App'x 547 (4th Cir. 2020) ("[W]hile the joinder of two or more petitioners in one petition is not a common practice in habeas corpus proceedings, joinder is permitted by Rule 20 of the Federal Rules of Civil Procedure and Rule 12 of the Rules Governing Habeas Corpus Cases. . . . Furthermore, [i]n this case, permissive joinder may be preferable, given that the Petitioners wish to pursue relief together and a single action would aid the goal of judicial economy.") (internal quotation omitted). And in the COVID-19 context, other courts are routinely granting relief to multiple detainees in different facilities. *See, e.g., Thakker v. Doll,* No. 1:20-CV-480, 2020 WL 1671563, at \*9 (M.D. Pa. Mar. 31, 2020) (ordering that 13 inmates in three facilities be immediately released on their own recognizance).

---

[14] *See Riggs v. Louisiana,* No. CV 3:20-0495, 2020 WL 1939168, at \*1 (W.D. La. Apr. 22, 2020) ("Newton indeed challenges the general prison conditions, but he seeks an accelerated release from prison, which is properly asserted as a habeas action, not as a civil rights action."); *Livas, et al. v. Myers, et al.,* No. 2:20-CV-00422, 2020 WL 1939583, at \*7 (W.D. La. Apr. 22,

same or similar results as the results reached here.[15]  And others have reached either

different or contrary results.[16]

---

2020) ("[Petitioners] bring this action [for immediate release] under § 2241, which is the proper vehicle for challenging 'the fact or length of confinement.'").

[15] *See, e.g., Vazquez Barrera*, 2020 WL 1904497, at *8 (granting in part a motion for TRO as a preliminary injunction and ordering a detainee's immediate release subject to appropriate conditions); *Essien v. Barr*, No. 20-CV-1034-WJM, 2020 WL 1974761, at *3 (D. Colo. Apr. 24, 2020) ("In theory, these causes of action are oil and water: a habeas claim may lead to an order releasing the prisoner or detainee or nothing at all; whereas a conditions-of-confinement claimant may only lead to an order requiring the government to improve the conditions of confinement, but not an order releasing the prisoner or detainee."); *Martinez Franco v. Jennings*, No. 20-CV-02474-CRB, 2020 WL 1976423, at *3 (N.D. Cal. Apr. 24, 2020) ("[I]t is "fairly well established" that a federal detainee can challenge the conditions of his confinement in an action brought under 28 U.S.C. § 2241."); *Doe v. Barr*, No. 20-CV-02141-LB, 2020 WL 1820667, at *8 (N.D. Cal. Apr. 12, 2020) ("[T]he court can address the petitioner's challenges to the conditions of confinement in a § 2241 petition."); *A.S.M. v. Donahue*, No. 7:20-CV-62 (CDL), 2020 WL 1847158, at *2 (M.D. Ga. Apr. 10, 2020) ("The remedy for this type of claim, however, is modification of the conditions of confinement to eliminate the constitutional violation. Release from custody is not a remedy for this type of claim."); *Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020) ("The plaintiffs' claims, as they have framed them, *do* bear on the duration of their confinement (they contend, ultimately, that they cannot be held in the Jail consistent with the Constitution's requirements), and they are not the sort of claims that are, or can be, appropriately addressed via a claim for damages."); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) ("Supreme Court and Sixth Circuit precedent support the conclusion that where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas."); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020) ("First, and most fundamentally, although the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is "the heart of habeas corpus.").

[16] *See, e.g., Jose D. v. Barr, et al.*, No. CV 20-4031 (KM), 2020 WL 1969893, at *4 (D.N.J. Apr. 24, 2020) ("Here, Petitioner is directly challenging the decision to deny his request for parole, which this Court is not authorized to review. Accordingly, this Court lacks jurisdiction over Petitioner's first claim for relief."); *Saillant v. Hoover, et al.*, No. 1:20-CV-00609, 2020 WL 1891854, at *3 (M.D. Pa. Apr. 16, 2020) (holding that immigration detainees stated a conditions claim, but finding the claim cognizable under § 2241 because the circumstances represented an "extreme case"); *Sacal-Micha v. Longoria*, No. 1:20-CV-37, 2020 WL 1815691, at *4 (S.D. Tex. Apr. 9, 2020) (finding a conditions of confinement claim where an elderly immigration detainee requested immediate release, but repeatedly complained that he was held in inadequate or unsafe "conditions").

But the logic of the majority comports with Supreme Court and Fifth Circuit precedent.  ICE detainees who are at elevated risk of contracting COVID-19 in a detention facility, and who seek immediate release, may do so through "fact or duration" claims asserted under 28 U.S.C. § 2241.

## C.    Injunctive Relief

Petitioners seeking immediate injunctive relief in the form of release from custody.  ECF No. 2.  A TRO is a form of equitable injunctive relief that preserves the status quo until there is an opportunity to hold a full hearing on an application for a preliminary injunction. *Atakapa Indian de Creole Nation v. Louisiana*, CV 18-0190, 2019 WL 660558, at *1 (W.D. La. Jan. 11, 2019) (citing Fed. R. Civ. P. 65(b)).

Rule 65(b) of the Federal Rules of Civil Procedure states, in pertinent part:

> (b)(1) Issuing Without Notice. The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give the notice and the reasons why it should not be required.

Here, there has been a full hearing on the application for injunctive relief, and Respondents have been heard.  "After an adverse party has been given notice, the court may properly convert a motion for a temporary restraining order into a request for a preliminary injunction." *Confident Care Home Health Servs., Inc. v. Azar*, CV H-18-3604, 2019 WL 3318135, at *2 (S.D. Tex. July 24, 2019) (citing *Esparza v. Board of Trustees*, 182 F.3d 915 (5th Cir. 1999) ("But when the adverse party has notice, the

protective provisions of rule 65(b) do not control, and the court has discretion to consider granting more lasting relief under a [preliminary injunction].")).

For a preliminary injunction, a Petitioner must show: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. *Bhatia v. Warden*, 1:16-CV-1125, 2017 WL 1026054, at *1 (W.D. La. Jan. 24, 2017), report and recommendation adopted, 1:16-CV-1125;, 2017 WL 1017634 (W.D. La. Mar. 15, 2017) (citing *Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005)).

A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries a burden of persuasion." Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex., 905 F.2d 63, 65 (5th Cir. 1990). "The denial of a preliminary injunction will be upheld where the movant has failed sufficiently to establish any one of the four criteria." Black Fire Fighters Ass'n, 905 F.2d at 65; see also Flores, 442 F. App'x at 165.

### 1.  Petitioners may be substantially likely to prevail on the merits.

Petitioners are civil detainees. As a result, Petitioners' detention must remain "nonpunitive in purpose and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S. Ct. 2491, 2499, 150 L. Ed. 2d 653 (2001). Prior criminal convictions do not affect this

legal status.  *See, e.g., Castillo v. Barr*, No. CV2000605TJHAFMX, 2020 WL 1502864, at *3 (C.D. Cal. Mar. 27, 2020) ) (citing *Zadvydas*, 533 U.S.C. at 690).

Civil immigration detainees are specifically entitled to the protections of the Fifth Amendment to the United States Constitution.  Its Due Process Clause, in relevant part, forbids the government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law."  Civil detention thus implicates the Due Process Clause: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690.  "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *See id.* at 693.

The Supreme Court has long held that civil detention must be justified: "[G]overnment detention violates that Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (internal citations and quotations omitted).  Civil detention becomes unconstitutional when "punitive" in nature, meaning "not [or no longer] reasonably related to a legitimate, non-punitive governmental objective." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

Thus, it is well settled that a civil immigration detainee is "the equivalent of a pretrial detainee," whose "constitutional claims are considered under the due process

clause instead of the Eighth Amendment." *See Edwards v. Johnson*, <u>209 F.3d 772,</u> <u>778</u> (5th Cir. 2000). However, the parties dispute the standard for Petitioners' claims. Respondents argue that Petitioners must prove ICE officials acted with "subjective deliberate indifference." Petitioners claim that they may prevail by proving that detention is not "reasonably related to a legitimate governmental objective," and therefore "punitive." *Bell v. Wolfish*, <u>441 U.S. 520, 539</u>, <u>99 S. Ct. 1861, 1874</u>, <u>60 L.</u> <u>Ed. 2d 447</u> (1979). Petitioners also argue, in the alternative, that they have established "subjective deliberate indifference" in ICE's response to COVID-19.

Here, yet another two-part distinction must be considered. And to compound the difficulty, on one side of the distinction are challenges to "general conditions of confinement." The term has different meaning here. On the other side of the distinction are challenges to a "particular act or omission."

The former category of claims is concerned with "constitutional challenges to conditions, practices, rules, or restrictions." *See Hare v. City of Corinth, Miss.*, <u>74</u> <u>F.3d 633, 644</u> (5th Cir. 1996). These challenges are subject to the "reasonable relationship" test outlined by the Supreme Court in *Wolfish*, and restated above. *See Scott v. Moore*, <u>114 F.3d 51, 53</u> (5th Cir. 1997). The latter category concerns "episodic acts or omissions" committed by specific officials. *Hare*, <u>74 F.3d at 644</u>. These challenges require a finding of deliberate indifference. *See Scott*, <u>114 F.3d at 53</u>.

The Fifth Circuit has described this distinction as well, and in so doing, has clarified that the distinction is separate from "conditions claims" discussed in the habeas corpus context:

> [A] condition may take the form of "a rule," a "restriction," "an
> identifiable intended condition or practice," or "acts or omissions" by a
> jail official that are "sufficiently extended or pervasive." *Estate of
> Henson v. Wichita Cty. Tex.*, 795 F.3d 456, 468 (5th Cir. 2015) (quoting
> *Duvall v. Dallas Cty.*, 631 F.3d 203, 207 (5th Cir. 2011)). "In some cases,
> a condition may reflect an unstated or *de facto* policy, as evidenced by a
> pattern of acts or omissions 'sufficiently extended or pervasive, or
> otherwise typical of extended or pervasive misconduct by [jail] officials,
> to prove an intended condition or practice.'" *Shepherd v. Dallas Cty.*, 591
> F.3d 445, 452 (5th Cir. 2009) (quoting *Hare*, 74 F.3d at 645). But
> "isolated examples of illness, injury, or even death, standing alone,
> cannot prove that conditions of confinement are constitutionally
> inadequate." *Id.* at 454. To prevail on a claim of unconstitutional
> conditions of confinement, a plaintiff must show: "(1) 'a rule or
> restriction or ... the existence of an identifiable intended condition or
> practice ... [or] that the jail official's acts or omissions were sufficiently
> extended or pervasive'; (2) which was not reasonably related to a
> legitimate governmental objective; and (3) which caused the violation of
> [the inmate's] constitutional rights." *Duvall*, 631 F.3d at 207 (quoting
> *Hare*, 74 F.3d at 645).

*Cadena v. El Paso Cty.*, 946 F.3d 717, 727 (5th Cir. 2020); *see also Shepherd v. Dallas
Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (a petitioner challenging general conditions
"is relieved from the burden of demonstrating a municipal entity's or individual jail
official's actual intent to punish"); *contra. Sacal-Micha*, 2020 WL 1815691, at *6 (S.D.
Tex. Apr. 9, 2020) ("Sacal [an immigration detainee] does not allege that the
conditions under which he is being held amount to punishment.").

In this case, Petitioners' claims challenge extended, pervasive circumstances
that they claim are – by act, omission, or plain necessity – prevalent in ICE detention
facilities, including the facilities housing them.  Petitioners' are more similar to, for
instance, a challenge to the "number of bunks in a cell or . . . television or mail
privileges." *See Scott*, 114 F.3d at 53.  Therefore, Petitioners' claims are subject to
the reasonable relationship test, not the deliberate indifference standard. *See id.*; *see*

20

*also Vazquez Barrera*, 2020 WL 1904497, at *5 (S.D. Tex. Apr. 17, 2020) (applying the *Wolfish* reasonable relationship standard to ICE detainees' request for immediate release in light of the COVID-19 pandemic); *contra Coronel*, 2020 WL 1487274, at *10 (applying the deliberate indifference standard to immigration detainees' substantive due process claims, but ordering detainees' release).

Under this standard, Petitioners may succeed on their substantive due process claims by establishing that detention does not *reasonable relate* to a legitimate governmental purpose.  They may make this showing, for example, by proving that, due to their age, immune deficiencies, or other comorbidities, they face an elevated risk of contracting the virus, or suffering serious illness from it; that their particular circumstances also heighten these risks; and that preventive measures are difficult or impossible, leaving them unduly exposed to contracting the virus.  *See Vazquez Barrera*, 2020 WL 1904497, at *5 ("Here, the Court finds that detention of Plaintiffs, who are at high risk of serious illness or death if they contract COVID-19, in MPC, where social distancing and proper hygiene are impossible, does not reasonably relate to a legitimate governmental purpose.").

Importantly, Petitioners' claims must be distinct in some respect.  *See Martinez Franco v. Jennings*, No. 20-CV-02474-CRB, 2020 WL 1976423, at *3 (N.D. Cal. Apr. 24, 2020) ("Franco does not identify, and the Court has not seen, a case finding that increased likelihood of contracting the virus rendered unconstitutional the detention of a person without underlying medical conditions or some other vulnerability.").  The Fifth Circuit has explained that "[t]he incidence of diseases or

infections, standing alone,' do not 'imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.'" *Valentine v. Collier*, No. 20-20207, <u>2020 WL 1934431</u>, at *3 (5th Cir. Apr. 22, 2020) (quoting *Shepherd v. Dallas Cty.*, <u>591 F.3d 445, 454</u> (5th Cir. 2009)).  This Court has already concluded the same: "[P]risoners are not entitled to release or transfer based solely on generalized COVID-19 fears and speculation." *Riggs v. Louisiana*, No. CV 3:20-0495, <u>2020 WL 1939168</u>, at *2 (W.D. La. Apr. 22, 2020).[17]  Otherwise, the claims of any prisoner or detainee would be equally meritorious – or equally meritless – notwithstanding their individual situations.  That result would be untenable.

To separate meritorious claims from generalized risk, some courts have focused upon underlying detainees' medical conditions, detainees' criminal histories or tendency toward violance, and the detention facility's response to the pandemic. *See Vazquez Barrera*, <u>2020 WL 1904497</u>, at *6.  Another court distilled a "non-exhaustive list of factors" to be considered. *Saillant,* <u>2020 WL 1891854</u>, at *4.  The best solution in this case may be to reconcile and supplement those salient approaches.  In addressing the merits of Petitioners' requests for habeas relief, the undersigned thus considers the following non-exhaustive list of factors:

(1) whether the petitioner has been diagnosed with COVID-19 or is experiencing symptoms consistent with the disease;

---

[17] And so have many others. *See, e.g.*, *United States v. Clark*, No. CR 17-85-SDD-RLB, <u>2020 WL 1557397</u>, at *4 (M.D. La. Apr. 1, 2020) ("Defendant cites no authority for the proposition that the *fear* of contracting a communicable disease warrants a sentence modification."); *Saillant v. Hoover, et al.,* No. 1:20-CV-00609, <u>2020 WL 1891854</u>, at *5 (M.D. Pa. Apr. 16, 2020) (denying habeas relief in part because the petitioner sought habeas corpus relief merely because he was "detained and subjected to a generalized risk of contracting COVID-19").

(2) whether the petitioner is among the group of individuals that is at higher risk of contracting COVID-19 as identified by the CDC, due to the petitioner's age or an underlying health condition;

(3) whether the petitioner has been, or has likely been, directly exposed to COVID-19;

(4) the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19;

(5) the efforts that detention facility officials have made to prevent or mitigate the spread of, or harm caused by, COVID-19;

(6) any danger to the community, or to the petitioner's immigration proceedings, that may be posed by the petitioner's release; and

(7) any other relevant factors.

*See Saillant,* 2020 WL 1891854, at *4; *Vazquez Barrera,* 2020 WL 1904497, at *6.

### 2.   Petitioners may face irreparable harm if not released.

In order to satisfy the "irreparable harm" requirement, Petitioners must establish that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008). But a court "need not await a tragic event" to afford injunctive relief. *Helling v. McKinney,* 509 U.S. 25, 33, 113 S. Ct. 2475, 2481, 125 L. Ed. 2d 22 (1993). Instead, the following familiar principles would apply:

> Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2013) [hereinafter Wright & Miller]. The focus of this inquiry is not so much the magnitude but the irreparability of the threatened harm. *See Callaway,* 489 F.2d at 575. The Fifth Circuit has defined irreparable harm to mean "harm for which there is no adequate remedy at law," such as monetary damages. *Daniels Health Scis., L.L.C. v. Vascular*

> *Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir.2013); *accord Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir.2011).
>
> Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id.* (alteration in original) (quoting Wright & Miller, *supra*, § 2948.1); *Morrell v. City of Shreveport*, 536 Fed.Appx. 433, 435 (5th Cir.2013). There must be more than "an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985). Accordingly, the party seeking a preliminary injunction must show that the threatened harm is "more than mere speculation." *Janvey*, 647 F.3d at 601; *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602 (1931) ("[An injunction] will not be granted against something merely feared as liable to occur at some indefinite time in the future."); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) ("[T]he injury must be both certain and great; it must be actual and not theoretical."). Therefore, "[a] presently existing actual threat must be shown." *Morrell*, 536 Fed.Appx. at 435 (alteration in original) (quoting *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir.2001)).

*Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582–83 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017).

Here, a Petitioner could establish irreparable harm in two ways. First, "[t]he alleged violation of a constitutional right is sufficient for a court to find irreparable harm." *Malam*, 2020 WL 1672662, at *10. Second, a Petitioner may prove that detention constitutes a significant and heightened risk that they will contract COVID-19. *See Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *13 (D. Md. Apr. 3, 2020) ("Petitioners have introduced uncontroverted evidence that contracting COVID-19 would put them at serious risk of severe medical complications and even death."). It is difficult to dispute that an elevated risk of contracting

24

COVID-19 poses a threat of irreparable harm. *See, e.g., Thakker, et al. v. Doll, et al.,* No. 1:20-CV-480, 2020 WL 1671563, at *7 (M.D. Pa. Mar. 31, 2020) (collecting data and cases). A colleague court described the general implications upon immigration detainees with comorbidities as follows:

> The COVID-19 pandemic has reached every state in our nation, and the numbers of infected and dead increase daily. According to the CDC, those with particular medical vulnerabilities, including Plaintiffs, are particularly susceptible to serious illness and death. There is currently no vaccine or cure for COVID-19. Medical experts have also concluded that continued detention in ICE facilities during the current pandemic presents an "imminent risk to the health and safety of immigrant detainees." Letter from Scott A. Allen, MD, FACP & Josiah Rich, MD, MPH to Committee Chairpersons and Ranking Members of House and Senate Committee on Homeland Security and Committee on Oversight and Reform 3 (Mar. 19, 2020), https://whistleblower.org/wp-content/uploads/2020/03/Drs.-Allen-and-Rich-3.20.2020-Letter-to-Congress.pdf.

*Vazquez Barrera*, 2020 WL 1904497, at *6; *see also Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("Courts have also recognized this health risk to be particularly acute—and of constitutional significance—for inmates who are elderly or have underlying illnesses.").

Unfortunately, Petitioners already have powerful evidence that the threat to them could be immediate: one of their number has already contracted COVID-19 during the course of this proceeding.

### 3. Petitioners' likely injuries may outweigh any legitimate government interest or injury.

The potential injuries facing Petitioners are of the gravest kind. Those who contract COVID-19 often suffer physically and mentally. That is especially true of the elderly or the sick. They endure severe and protracted illness, discomfort, and

pain.  They may suffer permanent injuries or disabilities.  They may die.  Again, one Petitioner is already facing these prospects.  And to the extent they can prove particularized risk, the remaining Petitioners could as well.

Respondents have legitimate countervailing interests: to protect the public and to ensure that Petitioners appear for future immigration proceedings or removal.  *See Vazquez Barrera*, 2020 WL 1904497, at *7; *Engelund v. Doll*, No. 4:20-CV-00604, 2020 WL 1974389, at *9 (M.D. Pa. Apr. 24, 2020.  The Court acknowledges and values those interests.  But their weight ilimited in several respects:

> [D]etention is not *necessary* to further Defendants' interest in preventing [detainees] from absconding. Rather, ICE has a number of alternative tools available to it to ensure enforcement, which it is free to use with [detainees] if they are released from detention. For example, ICE's conditional supervision program uses a combination of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting requirements to supervise individuals released from detention. (Doc. No. 12-1, at 27). An initial study of ICE's alternatives to detention reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings among supervised individuals. U.S. Gov't Accountability Office, GAO-15-26, *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness* 30 (2014).

*Vazquez Barrera*, 2020 WL 1904497, at *7.

To the contrary, a Petitioner's extended detention may actually place added strain on the already overburdened medical system, or delay, if not derail, immigration proceedings or deportation.  *Ali v. Dep't of Homeland Sec.*, No. 4:20-CV-0140, 2020 WL 1666074, at *5 (S.D. Tex. Apr. 2, 2020) ("If Petitioner endured significant exposure to those affected by the virus, that alone could further delay Petitioner's ultimate deportation.").

4.    Petitioners' release may not disserve the public interest.

Courts have referenced a detainee's criminal history and history of violence as public interest factors. *Vazquez Barrera*, 2020 WL 1904497, at *7. Of course, a detainee's criminal history cannot be decisive, because civil detention cannot masquerade for continued criminal detention for a prior offense. *See Vazquez Barrera*, 2020 WL 1904497, at *7. But again, the Court values these interests.

However, courts have also noted the public's interest in preventing or mitigating outbreaks, which invariably spread to correctional officers and other staff members, their families, and the public. *See Vazquez Barrera*, 2020 WL 1904497, at *7; *see also Thakker,*, 2020 WL 1671563, at *8 (Physical detention itself will place a burden on community healthcare systems and will needlessly endanger Petitioners, prison employees, and the greater community. We cannot see the rational basis of such a risk."). And yet again, the public interest may, in some situations, favor release: "In the highly unusual circumstances posed by the COVID-19 crisis, the continued detention of aging or ill civil detainees does not serve the public's interest. . . . ""To the contrary, public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions." *Basank*, 2020 WL 1481503, at *6.

D.    Detention Facilities and Petitioners

ICE has promulgated a set of Performance-Based National Detention Standards (the "National Detention Standards") which govern the conditions and circumstances under which detainees are held in custody and detention facilities are

operated.[18]  The PBNDS require ICE detention facilities to follow "guidelines for the prevention and control of infectious and communicable diseases."[19]

The CDC has issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."[20]   The "Guidance" sets forth operational and medical recommendations to detention facilities facing suspected or actual COVID-19 cases.

Respondents argue that ICE has taken measures, including some steps listed in the Guidance, in the six facilities now housing Petitioners.  Again to their credit, Respondents are careful not to overstate the case, and even clarify that ICE's responsive measures are "are "admittedly not perfect." ECF No. 8 at 17.  Respondents state that ICE will screen all necessary visitors, and will isolate detainees with or suspected of having COVID-19.

Through declarations, Respondents submit that staff and detainees have been educated on COVID-19, and as of April 22, 2020, all facilities have hand sanitizer, disinfection spray, soap, hot water, and gloves "in every housing unit." ECF No. 8-2 at 5.  But no amounts are provided for these materials.  Further, ICE is reviewing its detained population of people who are "at higher risk for severe illness" as identified by the CDC to determine if detention remains appropriate, "considering the

---

[18]  *2011 Operations Manual ICE Performance-Based National Detention Standards*, https://www.ice.gov/detention-standards/2011 (last visited Apr. 29, 2020).

[19]  *Id.* § 4.3 (II)(10).

[20]   Available   at   https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 29, 2020).

detainee's health, public safety and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect health, safety and well-being of its detainees." ECF No. 8-2 at 5-6.   But no time frames were (or reasonably could) be provided for these decisions. *See Coronel v. Decker*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at \*7 (S.D.N.Y. Mar. 27, 2020) ("Petitioners are uniquely vulnerable to COVID-19. The longer they spend in civil detention, the greater their chances of contracting the disease. A hearing *weeks* from now may be no relief at all, because Petitioners may contract COVID-19 in the interim and face serious health consequences—including death.").

Overall, despite the best efforts of ICE officials and officers braving to report for work in detention facilities, "individuals housed within detention centers," especially including these 16 Petitioners, "remain particularly vulnerable to infections." *Ali v. Dep't of Homeland Sec.*, No. 4:20-CV-0140, 2020 WL 1666074, at \*5 (S.D. Tex. Apr. 2, 2020) (and sources cited therein).   Unlike other courts, the undersigned cannot find that the corrective measures evidenced by Respondents are, in and of themselves, enough to moot Petitioners' claims altogether.   This is particularly true when considering the declarations and evidence submitted by Petitioners which indicates that the corrective measures are either woefully inadequate to protect them, or not being implemented at all.

Moreover, a number of Petitioners have been convicted of, and served sentences for, criminal offenses.  As discsussed above, however, and as decided by numerous other courts, a conviction alone cannot justify an alien's otherwise punitive

or unconstitutional detention.  The Court will consider, however, criminal convictions to the extent they may indicate violent or dangerous tendencies, especially when likely to be directed at identifiable individuals.

1.   <u>The LaSalle Ice Processing Center ("LIPC") currently houses nine Petitioners: Taluta Helen Dada, Griselda Del Bosque, Suresh Kumar, Nadira Sampath-Grant, Matilde Flores de Saavedra, Pardeep Kumar, Rosabel Carrera, Sonia Lemus-De Jasso, and Helen Saleh.</u>

LIPC is a private detention center run by The GEO Group, Inc. ("GEO").  <u>ECF No. 8-1 at 2</u>.  As of April 21, 2020, there were 904 detainees housed at the facility, which has capacity to house 1,170 detainees.  <u>ECF No. 8-1 at 2</u>.  Also as of April 21, 2020, three detainees had confirmed cases of COVID-19 at LIPC, and there was one suspected case.  <u>ECF No. 8-2 at 4</u>.  These detainees were isolated from all other detainees.  *Id.*  However, according to ICE, seven detainees had confirmed cases of COVID-19 as of April 28, 2020.

Given the known circumstances at LIPC, Petitioners housed there are all at moderate to high risk of exposure.

a.   <u>Petitioner Taluta Helen Dada should be released.</u>

Dada has neither tested positive nor reported, of record, symptoms of COVID-19.  And while Dada, at age 40, is younger than the CDC's risk threshold, Dada suffers from underlying medical issues that place her at elevated risk.  <u>ECF No. 8-1 at 3</u>.  Dada states that she suffers from Graves' Disease, which has required hospitalizations, radiation, and immunosuppressants.  <u>ECF No. 2-7 at 1</u>.  Dada also alleges that she suffers from hypothyroidism, asthma, malnutrition, and is immunocompromised.  *Id.* at 1-2.

Dada alleges that she is housed in dorm Falcon-D, which is at capacity with 80 detainees. ECF No. 2-7 at 2. Her dorm shares three working toilets, six showers, and eight telephones. *Id.* The toilets, showers, and telephones are sprayed by other detainees in the voluntary work program once a day, but those detainees do not wear masks. *Id.* Detainees in her dorm sleep in bunk beds about a yard and a half apart, and there is no hand sanitizer available. *Id.*

Dada was convicted in this District Court of conspiracy to defraud the United States to obtain immigration status, making false statements in connection with immigration documents, and mail fraud with forfeiture allegations. *See id.; United States v. Dada,* 3:18-CR-0086 (W.D. La.). She is currently awaiting a hearing with the immigration court. ECF No. 8-1 at 3. Therefore, she is not subject to a final order of removal. Dada alleges that she would live with her sister in Ruston, Louisiana if released. ECF No. 2-7 at 3.

Respondents did not state whether it considers Dada "at higher risk," or whether it has evaluated the appropriateness of her detention, specifically.

Dada's immigration and related convictions, while significant, do not indicate particularized risks of harm to the public, and do not outweigh the significant health risks she faces and the other factors favoring her release.

### b.      Petitioner Griselda Del Bosque should be released.

Del Bosque is 57 years-old and reportedly suffers from asthma, which puts her at elevated risk for COVID-19 complications. Her asthma is only partially controlled by the inhaler she was provided at LIPC. ECF No. 2-8 at 1. Del Bosque "has had

numerous asthma attacks and coughing fits while she has been detained." ECF No. 1 at 13. She also suffers from glaucoma and chronic arm, back, and knee pain. *Id.* She has neither tested positive nor reported, of record, symptoms of COVID-19.

Del Bosque states that she is housed in dorm Alpha-D with 80 other women whose beds are "less than a foot" apart. ECF No. 2-8 at 1. These 80 detainees also share three toilets, six showers, and eight telephones. *Id.*

Like Dada, Griselda Del Bosque (Del Bosque) is awaiting a hearing with the immigration court. She has not been ordered removed. ECF No. 8-1 at 4. Del Bosque recently completed a 235-month sentence for conspiracy to possess with intent to distribute a controlled substance, and she has been in ICE custody since January 3, 2020. ECF No. 8-1 at 3-4. Del Bosque maintains that she would reside with her daughter in Dallas, Texas, if released. ECF No. 2-8.

Respondents did not state whether it considers Del Bosque "at higher risk," or whether it has evaluated the appropriateness of her detention, specifically.

Del Bosque's narcotics conviction clearly arose from a serious offense. But she served her sentence, and has been in federal custody for a substantial amount of time. The nature of the offense, while significant, does not indicate violent tendencies or a particularized risk of harm. In fact, the length of the associated sentence and subsequent immigration custody mitigates the risk of harm to the public. And Del Bosque's criminal history does not outweigh the significant health risks she faces and the other factors favoring her release. This is particularly true given her asthmatic condition, which is respiratory in nature.

### c.   Petitioner Suresh Kumar should be released.

Kumar is only 37 years old, but he is at risk due to severe malnutrition resulting from a hunger strike.  ECF No. 1 at 14.   Kumar reports being force-fed liquid nutrients through a tube that runs through his nose and into his esophagus.  ECF No. 2-13 at 1.   S. Kumar alleges that he was diagnosed with Hepatitis C and a chronic liver infection.   *Id.*  He has neither tested positive nor reported, of record, symptoms of COVID-19.

Kumar reports that he is confined with Pardeep Kumar "in a 10 x 10 small room in the medical unit."  ECF No. 2-13 at 1.  S. Kumar alleges that the doctors do not wear masks when force-feeding him.  *Id.*

Although Suresh Kumar ("Kumar") was ordered removed on July 11, 2019, his appeal of that order still is pending with the Board of Immigration Appeals.  ECF No. 8-1 at 4.  Respondents do not allege that Kumar was ever convicted of a crime in the United States.  The Court is also unaware of any criminal history.  If released, Kumar will reside with his brother-in-law in Grants Pass, Oregon.  ECF No. 2-13 at 2.

Respondents did not state whether it considers S. Kumar "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.

Relevant factors – particularly Kumar's health conditions and attendant risks of contracting COVID-19, and Kumar's lack of criminal history – favor his release.

### d.   Petitioner Pardeep Kumar should be released.

Pardeep Kumar ("P. Kumar") is also at increased risk due to severe malnourishment from a hunger strike.  ECF No. 1 at 14.  P. Kumar reportedly

suffered a kidney infection in March 2020.  P. Kumar has neither tested positive nor reported, of record, symptoms of COVID-19.

Respondents do not claim that P. Kumar was convicted of a crime in the United States.  The Court is also unaware that he has any criminal history.  P. Kumar's appeal of his order of removal is also pending with the Board of Immigration Appeals. ECF No. 8-1 at 5.  Although ICE attempted to deport P. Kumar in February, 2020, the pilot refused due to P. Kumar's emaciated appearance.  ECF No. 2-12 at 1.  P. Kumar will reside with his uncle in Kent, Washington if released.  ECF No. 1-12 at 2.

Respondents do not state whether it considers P. Kumar "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.

For the same reasons as stated regarding Petitioner Kumar above, relevant factors favor P. Kumar's release.

e.    Petitioner Nadira Sampath-Grant should be released.

Nadira Sampath-Grant ("Sampath-Grant") is at great risk because she suffers from diabetes and diabetic-related complications such as neuropathy and issues with her kidneys.  She relies on oral medication for her diabetic care.  ECF No. 1 at 13. Sampath-Grant is 53 years old.  ECF No. 2-18 at 1.  Sampath-Grant has neither tested positive nor reported, of record, symptoms of COVID-19.

Sampath-Grant is also housed in dorm Falcon-D with 80 detainees.  As of the date of her declaration, Sampath-Grant reports that masks, gloves, and sanitizer were not available to detainees.  ECF No. 2-18 at 1.  Sampath-Grant submitted an

updated declaration dated April 21, 2020, indicating continued soap shortages.  ECF No. 9-5 at 1.  Sampath-Grant indicates that she has waited days waiting for soap.  *Id.*  Sampath-Grant also indicated that a detainee with fever was returned to the dorm after requesting medical care.  *Id.*

ICE states that Sampath-Grant was convicted of conspiracy to dispense and distribute oxycodone in the United States District Court for the Southern District of Florida.  After service of her sentence, she was ordered removed.  ECF No. 8-1 at 4.  ICE is "attempting to obtain travel documents" for her removal.  *Id.*  Of course, there is no certain information as to if or when travel documents will be obtained.  If released, she would reside with her husband and son in Ft. Lauderdale, Florida.  ECF No. 2-18 at 2.

Respondents do not state whether it considers Sampath-Grant "at higher risk," or whether it has evaluated the appropriateness of her detention, specifically.

For the same reasons stated above as to Petitioner Del Bosque, Sampath-Grant's narcotics-related criminal history, while significant, does not outweigh the severe risks posed by her detention.

### f.   Petitioner Matilde Flores de Saavedra should be released

Factors also weigh in favor of releasing Matilde Flores de Saavedra ("Flores de Saavedra"), who is at increased risk of complications from COVID-19 due to her age and medical conditions.  Flores de Saavedra is 78 years old and was recently diagnosed with diabetes, which remains uncontrolled, and hypertension.  ECF No. 2-

10 at 1; No. 1 at 21.  Flores de Saavedra has neither tested positive nor reported, of record, symptoms of COVID-19.

Flores de Saavedra is also housed in dorm Falcon-D, with close bunks and once-daily cleaning by detainees without masks.  ECF. No. 2-10 at 1.

Like Dada and Del Bosque, Flores de Saavedra is awaiting a hearing with the immigration court.  Last year she completed an eight-month sentence for conspiracy to transport undocumented aliens.  ECF No. 8-1 at 4.  If released, Flores de Saavedra would reside with her son in Falfurrias, Texas.

Respondents did not state whether it considers Flores de Saavedra "at higher risk," or whether it has evaluated the appropriateness of her detention, specifically.

For the same reasons stated above, Flores de Saavedra's immigration and related offenses, while significant, do not outweigh the other factors favoring her release, including her advanced age and the severe health risks she faces if detained.

### g.   Petitioner Rosabel Carrera should be released.

Rosabel Carrera ("Carrera") is also at a severely heightened risk of complications if she contracts COVID-19.  She is a 59-year-old with obesity, diabetes, and hypertension.  ECF No. 2-6 at 1.  She also has a history of heart attack and stroke. *Id.*

Carrera is also housed in dorm Falcon-D.  She, too, reported the 80 women in her dorm sharing three working toilets and six showers, with no access to disinfectants.  ECF No. 2-6 at 1.  In an updated declaration, Carrera reports that she recently went to the medical unit for a sore throat, "[a]mong other complaints," and

she was not tested for COVID-19.  ECF No. 9-8 at 1.  Carrera also states that "guards

sometimes wear masks, but sometimes they do not."  *Id.*  Detainees are sometimes

left without soap and a shortage of cleaning supplies.  *Id.*

An immigration judge terminated removal proceedings against Carrera in

2019, but ICE successfully appealed the decision.  Carrera is now awaiting a hearing

with the immigration court.  ECF No. 8-1 at 5.

Respondents do not state whether it considers Carrera "at higher risk," or

whether it has evaluated the appropriateness of her detention, specifically.

While Carrera reported one generalized symptom consistent with COVID-19,

she has not tested positive, she has not reported it was severe, and she has not

reported other symptoms or a protracted period of illness.  She does, however, face a

substantial risk of contracting the virus if detained, and no other factors strongly

favor her detention.

### h.   Petitioner Sonia Lemus Tejada Dejaso should be released.

Sonia Lemus Tejada Dejaso ("Dejaso") is 53 years old and suffers from

health conditions that leave her vulnerable to complications if she contracts

COVID-19.  Dejaso reportedly has heart disease and hypertension.  Dejaso has

neither tested positive nor reported, of record, symptoms of COVID-19.

After her conviction of harboring an alien for private gain, Dejaso was ordered

removed.  Her appeal is pending.  ECF No. 8-1 at 5.

Respondents do not state whether it considers Dejaso "at higher risk," or

whether it has evaluated the appropriateness of her detention, specifically.

Dejaso's immigration convictions, while significant, do not indicate particularized risks of harm to the public, and do not outweigh the significant health risks she faces and the other factors favoring her release.

### i.   Petitioner Hasan Saleh should be released.

Factors also weigh in favor of release for Hasan Saleh ("Saleh").  Saleh is 62 years old, and he suffers from diabetes, hypertension, and high cholesterol.  ECF No. 1 at 15.  Saleh has neither tested positive nor reported, of record, symptoms of COVID-19.

Saleh is housed in dorm Eagle-Charlie with about 72 other men.  As of the date of his declaration, none of the guards or detainees had masks or gloves.  ECF No. 2-17 at 1.

Saleh was ordered removed in February 2020 after service of his sentence for conspiracy to commit food stamp and wire fraud.  ECF No. 8-1 at 5-6.  Saleh would reside with his wife and five children in Ft. Lauderdale, Florida if he is released.  ECF No. 2-17 at 1.

Respondents do not state whether it considers Saleh "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.

Saleh's financial crimes convictions, while significant, do not indicate particularized risks of harm to the public, and do not outweigh the significant health risks he faces and the other factors favoring his release.  In parcular, his advanced age and underlying health conditions place him at elevated risk if detained.

2.  **Richwood Detention Center currently houses one Petitioner: Abraham Gebremedhim Gebremichael**

According Hartnett's declaration, Richwood Detention Center ("Richwood") is a private detention center run by LaSalle Corrections Corporation ("LCC"). ECF No. 8-1 at 2. As of April 21, 2020, there were 306 detainees housed at the facility, which has capacity to house 1,000 detainees. ECF No. 8-1 at 2. The ICE detainees are housed separately from other detainees. ECF No. 8-2 at 3.

As of April 21, 2020, Richwood had 29 detainees with confirmed cases of COVID-19 and five suspected cases. Many of the detainees with COVID-19 were transferred to Richwood from other facilities. ECF No. 8-2 at 4. These detainees "are isolated when possible" and are separated from the other population. *Id.* According to ICE, 45 detainees at Richwood had confirmed cases of COVID-19 as of April 28, 2020. And according to news reports cited above, two correctional officers have died of symptoms consistent with COVID-19.

Petitioner housed at this detention facility faces an elevated risk of exposure to, and contraction of, COVID-19.

a.  **Petitioner Abraham Gebremedhim Gebremichael should be released.**

Although Abraham Gebremedhim Gebremichael ("Gebremichael")'s age of 33 does not put him at high risk according to the CDC, he suffers from bradycardia and a slow heartbeat, which leaves his body without sufficient oxygen. ECF No. 2-11 at 1. He also experiences shortness of breath and fatigue as a result of his medical conditions. *Id.*

Gebremichael states he is housed in Unit C, with 110 other people.  ECF No. 2-11 at 1.   Gebremichael states that, as of the date of his declaration, there were insufficient cleaning supplies and soap.  ECF No. 2-11 at 2.

In his declaration, Gebremichael alleges that he has a cough, along with six or seven other people in his unit.  He says one other detainee had a high fever, but still slept in the Unit C.  ECF No. 2-11 at 2.

Gebremichael has been in ICE custody since August 13, 2019.  He had a scheduled immigration court hearing on April 29, 2020.   ECF No. 8-1 at 6. Respondents do not allege that Gebremichael was ever convicted of a crime.

Respondents do not state whether it considers Gebremichael "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.   If released, he would reside with his cousin in Houston, Texas.  ECF No. 1 at 14.

Gebremichael has experienced one generalized symptom consistent with COVID-19, but he has not tested positive or reported a protracted illness or other symptoms.   symptoms consistent with COVID-19.  With no criminal history, and a lengthy period of immigration detention, relevant factors, weigh in favor of his release.

3.   **Catahoula Correctional Center currently houses two Petitioners: Ronaldo Alex Colon and Karthikeyan Ponnusamy.**

According Hartnett's declaration, Catahoula Correctional Center ("CCC"). CCC is a private detention center run by LaSalle Corrections Corporation ("LCC"). ECF No. 8-1 at 2.  As of April 21, 2020, there were 529 detainees housed at the facility, which has capacity to house 750 detainees.  ECF No. 8-1 at 3.

Also as of April 21, 2020, CCC had one detainee that had tested positive for COVID-19, but he was transferred to Richwood.  There were also three suspected cases who were isolated until their COVID-19 tests came back negative.  <u>ECF No. 8-2 at 4</u>.  According to ICE, seven detainees at CCC tested positive for COVID-19 as of April 28, 2020.

With growing reported cases, Petitioners housed in this facility face a moderate to high risk of exposure or contraction.

a.  <u>Petitioner Ronaldo Alex Colon should be released.</u>

Ronaldo Alex Colon ("Colon") is a 47-year-old detainee with hypertension and high cholesterol.  <u>ECF No. 1 at 15</u>.  Colon alleges that he is in Room B with 100 others, sharing three toilets, one urinal, and six showers.  <u>ECF No. 2-4 at 1</u>.  As of the date of his declaration, Colon alleges that CCC is lacking cleaning supplies, gloves, and masks.  *Id.*  He also alleges that several people had flu-like symptoms.  *Id.*

Colon submitted an updated declaration on April 22, 2020.  <u>ECF NO. 9-7 at 1</u>.  Colon states that he was provided a "basic piece of cloth" to cover his mouth, but not a medical mask.  *Id.*  Colon says there are "still more than 100 people in the dorms closed in together for 23 hours of the day."  *Id.*   Colon alleges that utensils are rinsed only with hot water, and bathrooms only have small bars of soap.  *Id.*   Colon states that new detainees are still arriving daily.  *Id.*   Colon also states that CCC guards recently threw tear gas into the dorms.  *Id.*  Colon indicates that he recently had flu-like symptoms, but does not state that he was tested for COVID-19.  *Id.*

41

Colon has been detained for over a year since entering the United States.  ECF No. 2-4 at 1; ECF No. 8-1 at 6.  He has not been convicted of a crime.  Colon's appeal of his removal order is pending.  ECF No. 8-1 at 6.

Respondents do not state whether it considers Colon "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.   If released, Colon would reside with his sister in New York, New York.  ECF No. 2-4 at 1.

For all of the reasons stated regarding Petitioner Gebremichael above, relevant factors favor Petitioner Colon's release.

### b.   Petitioner Kathikeyan Ponnusamy should be released.

Although Karthikeyan Ponnusamy is only 41, he suffers from a host of medical conditions that put him at greater risk of complications from COVID-19.  Specifically, Ponnusamy has diabetes, hypertension, and Low Lactate Dehydrogenase—a blood thickening disease.  ECF No. 2-15 at 1.  Ponnusamy also reports suffering from depression, anxiety, and insomnia. *Id*.  Ponnusamy has neither tested positive nor reported, of record, symptoms of COVID-19.

Ponnusamy has been in custody since August 2019, and was ordered removed in January 2020.  His appeal of the removal order is pending.  ECF No. 8-1 at 6-7.  There are no claims that he has ever been convicted of a crime.

Respondents do not state whether it considers Ponnusamy "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.   If released, he would reside in Austin, Texas.  ECF No. 2-15 at 2.

Relevant factors – including a lack of criminal history and serious underlying health conditions – favor Ponnusamy's release.

### 4.   Jackson Parish Correctional Center currently houses one Petitioner: Aracelio Rodriguez.

According Hartnett's declaration, Jackson Parish Correctional Center ("JPCC") is a private detention center run by LCC.  <u>ECF No. 8-1 at 3</u>.  As of April 21, 2020, the date of his declaration, there were 502 detainees housed at the facility, which has capacity to house 1,000 detainees.  <u>ECF No. 8-1 at 3</u>.

As of the dates of Hartnett's declaration, JPCC had no suspected or confirmed cases of COVID-19.  According to the ICE website, there has been no change.

### a.   Petitioner Aracelio Rodriguez should not be released.

Aracelio Rodriguez is 61 years old and has "severe asthma."  <u>ECF No. 1 at 15</u>.  Rodriguez reports that he has "trouble breathing every day."  <u>ECF No. 2-16 at 1</u>.  Rodriguez has neither tested positive nor reported, of record, symptoms of COVID-19.

Rodriguez is housed in "one big dorm of about 100 people and there are only about 3 feet between each bed."  <u>ECF No. 2-16 at 2</u>.  As of the date of his declaration, he often lacked soap to wash his hands, and the staff did not wear masks or gloves.  *Id.*

Rodriguez has been in ICE custody since applying for entry to the United States in October 2019.  He was ordered removed on March 5, 2020, and his removal to Cuba is being arranged.  <u>ECF No. 8-1 at 7</u>.  ICE does not report any criminal

history.  Rodriguez provides that he would reside with his son in West Palm Beach, Florida if he is released.  ECF No. 2-16 at 2.

Respondents do not state whether it considers Rodriguez "at higher risk," or whether it has evaluated the appropriateness of his detention, specifically.

Rodriguez is a high-risk detainee due to his advanced age and underlying medical conditions.  But the risk of exposure at JPCC seems to be minimal at this point, with no confirmed or suspected cases having been reported, and minor shortcomings in sanitization having been reported.  Accordingly, relevant factors do not presently favor Rodriguez's release.

### 5.   Pine Prairie ICE Processing Center currently houses one Petitioner: Desmond Nkobenei.

According Hartnett's declaration, Pine Prairie ICE Processing Center ("PPIPC") is a private detention center run by GEO.  ECF No. 8-1 at 3.  As of Hartnett's declaration, there were 441 detainees housed at the facility, which has capacity to house 730 detainees.  ECF No. 8-1 at 3.

Hartnett's declaration also reports seven detainees with confirmed cases of COVID-19 and one suspected case at PPIC.  According to ICE's website, 19 detainees at PPIC had confirmed cases of COVID-19 as of April 29, 2020.

Petitioners at this facility face a moderate to high risk of exposure or contraction.

### a.   Petitioner Desmond Nkobenei should be released.

Desmond Nkobenei is only 25 years old, but suffers from hypertension. Nkobenei states that his medication has been increased several times.  ECF No. 2-14

44

at 1. Nkobenei has neither tested positive nor reported, of record, symptoms of COVID-19.

Nkobenei states that he is housed with 70 to 74 people in a small dorm with bunks less than a meter apart. Detainees share two working toilets, and there is no sanitizer or disinfectant. ECF No. 2-14 at 1. Nkobenei submitted an updated declaration on April 21, 2020, indicating that he and other detainees were each provided one single-use surgical mask and instructed to wash after each use. ECF No. 9-6 at 1. Nkobenei alleges that guards first threatened to withhold pay if he did not sign a form stating he had received an N95 mask. Nkobenei also states that his dorm is under quarantine. *Id.* Nkobenei also reports 17 new detainees were transferred into the facility on April 19, 2020. *Id.*

Nkobenei has been in custody since August 2019 when he entered the United States. He was ordered removed in February 2020, and his appeal is pending. ECF No. 8-1 at 7. If released, Nkobenei would reside with his cousin in Capitol Heights, Maryland. ECF No. 1 at 16.

Relevant factors – including his lack of criminal history, and his underlying medical conditions, which are among the conditions that place individuals at highest risk – favor Nkobenei's release.

### 6. Winn Correctional Center currently houses two Petitioners: Sigous Asgari and Eduardo Devora Espinosa.

According Hartnett's declaration, Winn Correctional Center ("WCC") is a private detention center run by LCC. ECF No. 8-1 at 2. As of April 21, 2020, there

were 795 ICE detainees housed at the facility, which has capacity to house 1,553 detainees.  ECF No. 8-1 at 2.

As of April 21, 2020, WCC had three detainees with confirmed cases of COVID-19 and one suspected case.  ECF No. 8-1 at 2.  According to ICE's website, the numbers have not changed.

Petitioners housed at this facility face moderate to high risk of exposure and contraction.

a.   Petitioner Sigous Asgari should not be released.

According to updated filings from Petitioners' counsel, Sigous Asgari ("Asgari") has tested positive for COVID-19.  ECF No. 15.  Asgari has also developed a blood clot.  *Id.*  Asgari is 59 years old and has a history of Grade 2 Fatty Liver Disease as well as "hypertension and a chronic lung condition which has led to several lung infections and bouts with pneumonia."  *Id.*; ECF No. 1 at 12.  Asgari's medical conditions put him at great risk of complications from COVID-19.

At last reporting, Asgari is reportedly under medical supervision in a negative pressure isolation unit at Winn.  ECF No. 15.  Although counsel for Asgari claims that ICE's care is, generally, deficient and dangerous to detainees like Asgari, the record presently contains no other specific information beyond those representations as to Asgari's actual treatment at Winn.  Counsel for Respondents has maintained at least some contact with Winn medical personnel, who reported Asgari remained under medical supervision.

Asgari was scheduled for removal in March and April 2020, but the flights were cancelled due to COVID-19 restrictions.  ECF No. 8-1 at 6.  Asgari would reportedly live with a daughter in Redwood City, California if released.  ECF No. 1 at 12.

Asgari's circumstances – again, at present and given what little has been reported of record – do not warrant release.  Nor is the Court, at present, convinced that Asgari's release would not endanger the public, and would necessarily improve, his medical condition.  Should more information become known, this calculus may change.  But given Asgari's unfortunate circumstances, and the lack of known details or alternatives at present, Asgari should not be released.

### b.   Petitioner Eduardo Devora Espinosa has already been released.

According to Hartnett's declaration, Eduardo Devora Espinosa ("Espinosa") was released on parole on April 15, 2020.  Therefore, his request for release is moot.

## III.   Conclusion

IT IS RECOMMENDED that the Court GRANT IN PART Petitioners' Motion for Temporary Restraining Order (ECF No. 2) in the form of a PRELIMINARY INJUNCTION requiring the IMMEDIATE RELEASE of the Petitioners identified above pending resolution of their immigration proceedings or removal, and under CONDITIONS to be specified by DHS/ICE but to exclude subsequent arrest and detention, unless an identified Petitioner violates another condition of release, attempts to abscond, or commits any criminal offense.

IT IS FURTHER RECOMMENDED that the Court decline to require any Petitioner released to post a bond or other security.  *See* Fed. R. Civ. P. 65(c); *A.T.N.*

*Indus., Inc. v. Gross* , 632 F. App'x 185, 192 (5th Cir. 2015) ("[U]nder Rule 65(c), a court may elect to require no security at all.") (internal citation and quotation omitted).

IT IS FURTHER RECOMMENDED that the Motion for Temporary Restraining Order (ECF No. 2) be DENIED IN PART in all other respects, and as to all other Petitioners.

IT IS FURTHER ORDERED that, given the urgency of the relief sought and recommended above, the objections periods set forth in 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b) be EXPEDITED, and that any party wishing to object to this Report and Recommendation do so on or before Monday, May 4, 2020.  The District Judge will consider timely objections before issuing a final ruling.  A party's failure to file written objections to the proposed factual findings, conclusions, and  recommendations contained in this Report and Recommendation shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Alexandria, Louisiana, on this 30th day of April 2020.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE